UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> ADVANCED COMPREHENSIVE LABORATORY LLC d/b/a TOPLAB, MARK GLADSTEIN, M.D., VICTORIA FRENKEL, AND VADIM DOLSKY, <br><br> Defendants. | C.A. No. |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

I.      **INTRODUCTION**

1.      Defendant Advanced Comprehensive Laboratory LLC d/b/a TopLab ("TopLab") defrauded Allstate by billing for fraudulent and medically unnecessary laboratory tests, including urine drug testing ("UDT").

2.      TopLab is owned by Defendants Mark Gladstein, M.D. ("Gladstein"), Victoria Frenkel ("Frenkel"), and Vadim Dolsky ("Dolsky").

1

3.     TopLab exploited automobile accident victims ("claimants") by billing for bogus laboratory testing, and then using the claimants' No-Fault insurance coverage to collect payment from Allstate.

4.     New York Insurance Law (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, *et seq.*) (hereinafter collectively referred to as "New York's No-Fault laws"), provide eligible claimants with benefits of at least $50,000.00 to cover the "basic economic loss" resulting from injuries caused by the operation of a motor vehicle. "Basic economic loss" includes "all necessary expenses" for medical services, including laboratory testing that is medically necessary and clinically indicated.  *See* N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

5.     New York's No-Fault laws are designed to protect accident victims regardless of fault, and to facilitate prompt payment of No-Fault claims.  Claimants may assign their No-Fault benefits to medical providers, who may then seek payment directly from the claimant's insurer.

6.     Providers are not eligible to collect No-Fault payments if they violate applicable licensing laws, including regulations that prohibit billing for unnecessary tests, and making payments in exchange for referrals.

7.     The Defendants misrepresented TopLab's eligibility for No-Fault payments each time a TopLab No-Fault claim was submitted to Allstate.

8.     The Defendants violated New York law by billing for unnecessary laboratory testing.  TopLab's No-Fault claims were fraudulent and not compensable because the testing was not medically necessary; in fact, the tests served no legitimate purpose other than to create billing opportunities for TopLab, particularly in cases where the results were ultimately ignored or not timely reported.

9.      Claimants were ordered to undergo UDT for prescription risk monitoring or for pre-surgical clearance.  The Defendants focused on UDT because they knew TopLab could charge costly fees in connection with No-Fault claims.

10.     The Defendants also violated New York law by participating in prohibited referral arrangements.

11.     The Defendants needed a steady stream of referrals for testing, so they conspired with other providers and facilities to generate testing orders.  The Defendants and their associates influenced or controlled the prescribers, who were required to order testing during patient examinations.  Fraudulent predetermined treatment protocols ensured that testing was ordered for all claimants regardless of medical need; the testing orders were then steered to TopLab.

12.     TopLab billed for numerous laboratory tests ordered by providers involved in the massive criminal referral scheme alleged in *United States v. Rose*, No. 19-cr-00789-PGG (S.D.N.Y.), which involves bribery, illegal referrals, and fraudulent medical services.  TopLab also obtained many referrals from No-Fault clinics involved in the criminal scheme alleged in *United States v. Gulkarov*, No. 22-cr-00020-PGG (S.D.N.Y.), which accounted for more than $30 million in billing for fraudulent medical treatments.  The Defendants' referral conduct violated applicable licensing laws and rendered TopLab ineligible to collect No-Fault payments.

13.     The Defendants' scheme relied on the U.S. Mail, which was used by the Defendants (and persons working under their direction and control) to transmit records, reports, bills, and other claim-related documents to Allstate in support of TopLab's No-Fault claims.

14.     The Defendants knew that TopLab was ineligible to collect No-Fault payments, yet they still created statutory claim forms that falsely certified TopLab's eligibility to collect No-Fault payments.

3

15.     Allstate reasonably relied on the facial validity of the records and bills mailed by TopLab—and the representations contained therein—when making payments on TopLab's No-Fault claims.

16.     By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

17.     This action seeks actual damages of more than $1,070,000.00, which represent No-Fault payments that Allstate was wrongfully induced to make to TopLab during the course of this scheme.

18.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to TopLab (or its agents) in connection with any No-Fault claims submitted to Allstate.

19.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

20.     The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to TopLab for the benefit of the Defendants.

21.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many cases obtained—payment for medical services that were not compensable under New York's No-Fault laws.

22.     The Defendants knew that the claimants identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

23.     Allstate estimates that the Defendants purposely mailed hundreds of documents in support of TopLab's No-Fault claims even though the Defendants knew that TopLab's claims were not compensable under New York's No-Fault laws.

## II.   PARTIES

### A.   PLAINTIFFS

24.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

25.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

### B.   DEFENDANTS

#### 1.    Advanced Comprehensive Laboratory LLC d/b/a TopLab

26.     Advanced Comprehensive Laboratory LLC is a limited liability company organized under the laws of New Jersey.

27.     Advanced Comprehensive Laboratory LLC operates a diagnostics laboratory under the fictitious name "TopLab."

28.     TopLab's principal place of business is located in Millburn, New Jersey, but most of TopLab's business is sourced from medical providers located in New York.  TopLab applied for authorization to conduct business in New York as a foreign limited liability company in New York, but not until January 10, 2020—which was years after TopLab actually began conducting business in New York.

29.     TopLab is an enterprise whose activities affect interstate commerce.

30.     TopLab is owned by Gladstein, Frenkel, and Dolsky, all of whom participated in the operation and management of the TopLab enterprise during the relevant period.

31.     TopLab billed for laboratory services in connection with Allstate claimants.

32.     TopLab used the U.S. Mail to submit fraudulent No-Fault claims to Allstate throughout the course of this scheme.

33.     TopLab's bills were fraudulent because the testing was prescribed pursuant to predetermined protocols that required laboratory testing for all claimants regardless of need.

34.     The Defendants violated numerous applicable New York licensing requirements while operating TopLab, which means TopLab was never lawfully entitled to seek or collect No-Fault payments under New York Insurance Law § 5102.

35.     The Defendants damaged Allstate by causing TopLab to collect payments on fraudulent and non-compensable No-Fault claims.

### 2.    Mark Gladstein, M.D.

36.     Gladstein resides in and is a citizen of New York.

37.     Gladstein is a physician and is licensed to practice medicine in New York.

38.     Gladstein owns and operates TopLab.

39.     Gladstein participated in the operation and management of TopLab during the relevant period, and is therefore responsible for the fraudulent and non-compensable services billed by TopLab in connection with the claimants at issue in this Complaint.

### 3.    Victoria Frenkel

40.     Victoria Frenkel resides in and is a citizen of New York.

41.     Frenkel is an unlicensed person and is not authorized to practice any healthcare profession in New York.

42.     Frenkel owns and operates TopLab.

43.     Frenkel participated in the operation and management of TopLab during the relevant period, and is therefore responsible for the fraudulent and non-compensable services billed by TopLab in connection with the claimants at issue in this Complaint.

### 4.     <u>Vadim Dolsky</u>

44.     Dolsky resides in San Juan, Puerto Rico and in New Jersey.

45.     Dolsky is licensed to practice acupuncture in New York.

46.     Dolsky owns and operates TopLab.

47.     Dolsky also owns and operates a surgery center, a pharmacy, and numerous acupuncture and testing companies; he also owns several other financing, real estate, consulting, and marketing companies.

48.     Dolsky is linked to a No-Fault fraud scheme that involves billing for fraudulent and medically unnecessary services, including bogus laboratory testing.  *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C., et al.*, No. 1:21-cv-05523-MKB-PK (E.D.N.Y.).

49.     Dolsky participated in the operation and management of TopLab during the relevant period, and is therefore responsible for the fraudulent and non-compensable services billed by TopLab in connection with the claimants at issue in this Complaint.

## III.     <u>JURISDICTION AND VENUE</u>

50.     Subject matter jurisdiction of this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

51.     Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

52.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the Eastern District of New York is the District where a substantial part of the acts known to Allstate alleged herein were carried out.

53.     The Defendants purposefully availed themselves of the privileges and protections provided under New York law by submitting No-Fault claims in connection with Allstate claimants.

54.     The Defendants' activities in and contacts with New York were deliberately undertaken to take advantage of New York's No-Fault laws, which means there is a substantial relationship between Allstate's causes of action and the Defendants' contacts with New York.

55.     The Defendants' contacts with New York include, without limitation, (a) registering TopLab to conduct business in New York, (b) operating TopLab as a foreign LLC within New York, (c) engaging and transacting with prescribers and clinics in New York, (d) collecting testing specimens in New York, (e) delivering testing results and reports to New York providers and claimants, (f) submitting No-Fault claims on behalf of New York residents or persons covered under New York automobile insurance policies issued by Allstate, and (g) in the case of Dolsky, Frenkel, and Gladstein, owning and operating other businesses organized under New York law.

## IV.     APPLICABLE LAWS AND REGULATIONS

### A.     GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

56.     Allstate underwrites automobile insurance in New York.

57.     Injured claimants can recover their basic economic losses resulting from a covered automobile accident, including "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.  New York's No-Fault laws provide coverage of at least $50,000.00 for each eligible claimant.

58.     Claimants can assign their No-Fault benefits to third-parties, such as laboratory testing companies.  Under a duly executed assignment, the provider may submit claims directly to an insurance company and receive payment for necessary testing services rendered.

### B.     ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS

59.     Medical providers are not eligible to collect payment under New York's No-Fault laws if they fail to meet **_any_** applicable New York State or local licensing requirements necessary to perform those services in New York.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

60.     Insurers may withhold No-Fault payments to a medical provider when there is a "willful and material failure" by the provider to abide by licensing laws and regulations.  *State Farm Mut. Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758, 761 (N.Y. 2005); 11 N.Y.C.R.R. § 65-3.16(a)(12).

61.     Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

62.     Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor, or

consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

63.     New York law prohibits physicians and physician assistants from "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services." *See* N.Y. Educ. Law § 6530(18).

64.     Under New York Public Health Law § 238-a(1)(a), a practitioner authorized to order clinical laboratory services may not make a referral to another provider in which the ordering practitioner has a financial relationship.  Prohibited financial relationships include compensation agreements, contracts that exceed fair market value, and agreements in which compensation is variable based on the volume of referrals.

65.     New York law prohibits clinical laboratories from paying kickbacks in exchange for patient referrals or splitting fees with healthcare providers.

66.     New York Public Health Law § 587(2) provides that "no clinical laboratory or its agent, employee or fiduciary shall make, offer, give, or agree to make, offer or give any payment or other consideration in any form to the extent such payment or other consideration is given for the referral of services or participate in the division, transference, assignment, rebate, splitting of fees, with any health services purveyor, or with another clinical laboratory."  *See also* 10 N.Y.C.R.R. § 34-2.4.

67.     A "health services purveyor" includes professional corporations and their agents and employees. *See* N.Y. Pub. Health Law § 585.

68.     New York Public Health Law § 574 prohibits anyone from owning or operating "a clinical laboratory located in or accepting specimens from New York state" unless they have been issued a valid permit in accordance with New York Public Health Law § 575

69.     Providers are prohibited under New York law from submitting bills for clinical laboratory services when the services were furnished pursuant to a prohibited referral. *See* N.Y. Pub. Health Law § 238-a(1)(b).

70.     Providers must also bill in accordance with the schedule of fees established by the New York Workers' Compensation Board ("Fee Schedule").  The Fee Schedule is used by providers and insurers to determine the level of reimbursement payable on legitimate claims. Under New York's No-Fault laws, healthcare providers are prohibited from submitting charges that exceed the amounts set forth in the Fee Schedule.

### C.     CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS

71.     Providers can submit No-Fault claims by using the statutory claim form styled "Verification of Treatment by Attending Physician or Other Provider of Health Service" (hereinafter referred to as "NF-3" or "NF-3 bill").

72.     Providers can also submit No-Fault claims using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

73.     The use of NF-3 and CMS-1500 forms is significant because the forms contain a certification that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

74.     Under New York law, providers must verify their NF-3 submissions subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or

11

> statement of claim containing any materially false information, or
> conceals for the purpose of misleading, information concerning any
> fact material thereto, commits a fraudulent insurance act, which is a
> crime…

N.Y. Ins. Law § 403(d).

75.     Providers are not allowed to misrepresent their No-Fault eligibility when submitting claims.  A provider's misrepresentation (or omission) of material facts can take many forms, such as giving false or misleading information about the necessity of the service, the identity of the actual provider of the service, or compliance with Fee Schedule requirements.

76.     It is a material misrepresentation to submit NF-3 and CMS-1500 forms for (a) services that are never provided, (b) services that are billed by an entity that performed no actual services, (c) services that are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided, or (d) services that are billed at a greater monetary charge than is permitted under the Fee Schedule.

77.     A provider's representations of the necessity of the service are material because providers are only eligible to collect No-Fault payments under N.Y. Ins. Law § 5102(a) if the billed-for services are necessary.  *See* N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

78.     The Defendants' scheme is massive and ongoing.  Several other insurers have claimed they were victimized by TopLab's fraudulent claims.  *Gov't Empls. Ins. Co. v. Advanced Comprehensive Lab., LLC, et al.*, No. 1:20-cv-02391-KAM-VMS (E.D.N.Y.); *Am. Transit Ins. Co. v. Advanced Comprehensive Lab., LLC, et al.*, No. 1:21-cv-00413-MKB-PK (E.D.N.Y.); *Liberty Mut. Ins. Co. v. Advanced Comprehensive Lab., LLC, et al.*, No. 1:22-cv-3541-AMD-JRC (E.D.N.Y.).  The allegations in these actions detail similar patterns of billing for bogus testing and paying kickbacks for patient referrals.  *Id.*

79.     In these 3 cases alone, TopLab billed over $14 million in connection with claimants covered by the victim insurers who, collectively, account for less than 40% of the No-Fault marketplace in New York, which underscores the magnitude of the Defendants' scheme.

A.     UNLAWFUL PATIENT REFERRALS

80.     The Defendants sought to maximize profits at the expense of claimants.

81.     Eligible claimants were important to this scheme because each one was eligible to seek No-Fault payments totaling at least $50,000.00 for necessary medical expenses.  Claimants could also assign their No-Fault benefits to TopLab, which enabled the Defendants to collect No-Fault payments directly from insurers.

82.     The scheme targeted claimants involved in motor vehicle accidents who were (a) allegedly receiving medical treatment at New York-based pain management centers, and (b) subsequently ordered to undergo minimally invasive, low-risk procedures at a network of ambulatory surgical centers in New York and New Jersey.

83.     Many of the tests billed by TopLab were ordered by providers working at facilities owned by Moshe (collectively, the "Moshe ASCs").[1]

84.     The connections to Moshe are important given his history of involvement in No-Fault fraud schemes, especially the ones involving the illegal ownership and control of medical PCs[2] because a substantial number of TopLab's bills were for tests ordered through medical PCs

---

[1] The term "Moshe ASCs" means SCOB, LLC d/b/a Surgicare of Brooklyn ("SCOB"), Integrated Specialty ASC, LLC f/k/a Healthplus Surgery Center LLC ("Integrated"), Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center LLC ("Dynamic"), Excel Surgery Center LLC ("Excel"), and NJMHMC LLC d/b/a Hudson Regional Hospital ("Hudson Regional").

[2] *See, e.g.*, *Allstate Ins. Co. v. Ilyaich, et al.*, No. 1:13-cv-05464-NG-LB (E.D.N.Y.); *Liberty Mut. Ins. Co. v. Nexray Med. Imaging, P.C.*, No. 1:12-cv-05666-NGG-VMS (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Ushyarov, et al.*, No. 1:11-cv-03657-SJ-SMG (E.D.N.Y.); *Gov't Empls. Ins. Co. v. New Hyde Park Imaging, P.C., et al.*, No. 1:11-cv-01166-FB-ALC (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. Bronx Healthcare Med., P.C., et al.*, No. 2:08-cv-04912-LDW-ARL (E.D.N.Y.); *Travelers Indem. Co. v. Liberty Med. Imaging Assocs., P.C., et al.*, No. 1:07-cv-02519-CPS-JO

under Moshe's control, including non-parties Metro Pain Specialists, P.C. and Premier Anesthesia, PA.

85.     The Defendants have personal and professional relationships with Moshe, which enabled them to exploit patients of the Moshe ASCs as a primary source of patient referrals.

86.     For example, Gladstein works for Moshe at Hudson Regional as a pain management physician.  Dolsky also has numerous links to Moshe.  Dolsky owns non-party Atlantis Surgery Center LLC ("Atlantis"), which is an ASC located at 321 Essex Street in Hackensack, New Jersey—the same location as one of the Moshe ASCs.  Atlantis also shares the same phone number and contact email address with one of the Moshe ASCs.

87.     Atlantis is part of a group that provides ASC facility services to an enterprise known as "CitiMed."  The CitiMed enterprise is comprised of numerous providers, including medical PCs purportedly owned by Moshe's sister, non-party physician Regina Moshe, M.D.  CitiMed has been sued in other fraud actions in this District based on billing for fraudulent services, unlawful referrals, and illegal ownership by Moshe.  *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C., et al.*, No. 1:21-cv-05523-MKB-PK (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Yan Moshe a/k/a Yan Leviev, et al.*, No. 1:20-cv-01098-FB-RER (E.D.N.Y.).

88.     Dolsky is also involved with non-party Ohel Joseph Burho Toxsur Inc., which is a religious charitable organization headed by Moshe.  The charity's House of Worship is located inside a building owned by Moshe at 6336 99th Street in Rego Park, NY, which is the same address used by CitiMed.  Dolsky attended the charity's first meeting and voted to elect Moshe as president of the charity.  Notably, CitiMed was a significant source of referrals for TopLab during the relevant period.

---

(E.D.N.Y.); and *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., et al*., No. 1:04-cv-05045-ILG-RLM (E.D.N.Y.).

89.     Dolsky's relationship to Moshe is relevant given Moshe's background and history of controlling No-Fault providers.

90.     Most of TopLab's testing referrals came from No-Fault clinics, or from providers working at a Moshe ASC.  Claimants were subjected to predetermined treatment protocols, which usually started with an initial examination by providers such as non-party Metro Pain Specialists, P.C. ("MPS").

91.     MPS provided pain management services at numerous No-Fault clinics located throughout the Bronx, Brooklyn and Queens.  MPS has been sued for its involvement in No-Fault fraud schemes and for being under Moshe's unlawful control.  *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C., et al.*, No. 1:21-cv-05523-MKB-PK (E.D.N.Y.) and *Allstate Ins. Co. v. Metro Pain Specialists P.C., et al.*, No. 1:21-cv-05586-DG-RER (E.D.N.Y.). Dolsky transacted with MPS to generate referrals to TopLab.  Dolsky made payments to MPS through a shell company, which were intended to help facilitate referrals to TopLab.  MPS generated a substantial number of referrals to TopLab during the course of this scheme.

92.     Providers that worked for MPS have reported that they were required to refer all claimants for UDT regardless of medical need.  Non-party physician William Elton, M.D. ("Elton") has testified that he was required to order drug tests for all patients as a condition of working for MPS.  Elton was admonished when he failed to prescribe UDT for MPS patients. Elton was one of the highest referral sources for TopLab.  Elton stopped working for MPS after learning that other personnel were issuing prescriptions under his name without approval.

93.     Other providers working for MPS, including Michael Alleyne, M.D. ("Alleyne"), who was a source of referrals of unnecessary UDT to TopLab, have stated under oath that they were required by MPS clinic staff to refer patients for additional services pursuant to a

predetermined protocol.  Like Elton, Alleyne also was admonished if he did not adhere to the treatment "regimen" to be imposed on MPS patients.  Alleyne also confirmed that altered and fraudulent prescriptions were submitted under his name without his authority.  *Gov't Empls. Ins. Co. v. Avonora, Inc. d/b/a Avonora Pharmacy*, No. 23-cv-03409-ARR-MMH (E.D.N.Y.) (citing Alleyne's sworn affidavit detailing the treatment "regimen" imposed on MPS patients and the unauthorized prescriptions submitted under his name that were forged and/or altered without his knowledge in support of allegations of unlawful referral relationships between illegitimate pharmacies and MPS clinics); *Gov't Empls. Ins. Co. v. Orthopain Supply, Inc.*, No. 23-cv-03413-RPK-RER (E.D.N.Y.) (citing to statements under oath of MPS providers Alleyne and Patricia Kelly, D.O. regarding unauthorized prescriptions for durable medical equipment (DME) with copies or forgeries of their signature used without their consent in support of allegations of unlawful referral relationships between illegitimate DME providers and MPS clinics).

94.     MPS also referred numerous claimants to the Moshe ASCs for surgeries; those claimants were then referred to TopLab for testing in connection with the procedures.

95.     The testing orders were generated by providers working at the Moshe ASCs. Claimants were ordered to undergo UDT on the day of the surgical procedure; many tests were ordered as necessary for pre-surgical clearance.

96.     Control of the prescribers was key to the success of the Defendants' scheme. Providers were instructed to order UDT for every patient—regardless of medical need.  The Defendants resorted to other means to control the flow of referrals to TopLab.

97.     TopLab has been implicated in the unauthorized use of a physician's credential. Non-party physician Arkam Rehman, M.D. ("Rehman") stated in a sworn declaration that TopLab

billed for testing that he never prescribed or authorized.  *See Liberty Mut. Ins. Co. v. AVK Rx Inc. et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.).

98.    Here, Rehman purportedly ordered UDT for numerous Allstate claimants.  The tests were billed by TopLab.

99.    For example, in connection with claimant N.A. (claim no. 0600671804), TopLab billed Allstate a total of $2,492.88 for UDT purportedly prescribed by Rehman, according to TopLab's testing report:



100.    As another example, TopLab billed Allstate a total of $2,686.92 for UDT in connection with claimant J.F. (claim no. 0579334038), which was supposedly prescribed by Rehman.



101.     In both examples, Rehman supposedly prescribed the UDT from a clinic located at 3027 Avenue V in Brooklyn, NY, which is the same facility that generated the phony TopLab prescriptions identified by Rehman.

102.     Moreover, these unauthorized and fraudulent TopLab reports cited by Rehman pertained to specimens purportedly received by TopLab on October 21-22, 2020, which was within days of TopLab's reported receipt of the specimens in the examples above.

103.     Upon information and belief, based on Rehman's previous admissions that TopLab's UDT reports pursuant to orders under Rehman's name and credentials were fraudulent, each of TopLab's reports for UDT purportedly ordered by Rehman are likewise false and fraudulent, and any charges for these services are not compensable.

**B.     BILLING FOR FRAUDULENT URINE DRUG TESTING ("UDT")**

104.     UDT is indicated for monitoring comprehensive risk in patients, but only in select cases, such as when patients are either taking or are prescribed opioids for chronic pain.

105.     UDT is not universally warranted for all patients.  UDT is not routinely ordered in advance of pain management injections, routine surgeries, or anesthesia services in a legitimate clinical setting.

1. **General Overview of UDT**

   a. ***Point of Care Presumptive Testing***

106.     Point of care ("POC") testing is performed outside of a laboratory, typically at or near the point of care (i.e., in an office setting following collection of urine or blood sample). Known as "presumptive testing" (and formerly as "qualitative testing"), POC testing detects whether a particular drug, analyte, constituent, or condition is present.

107.     The results of POC testing are reported as "positive" or "negative," which shows the presence or absence of drugs.

108.     When UDT is indicated, POC testing is used as a first-line urine screening tool, otherwise known as "drug screens."

109.     The purpose of performing POC drug screens is to determine quickly and reasonably accurately whether a drug or drug class is likely to be present in the specimen.

110.     Presumptive testing is performed to distinguish "unexpected results" (which may require additional confirmation testing) from "expected results" (which generally do not require any further testing).

111.     Presumptive testing is not warranted for all patients.  The Fee Schedule states that UDT should be used in the management of chronic opioid use, but not as part of a non-acute pain management treatment protocol.  When indicated, POC testing should be conducted using a quick or rapid screening test method utilizing a stick/dip stick, cup or similar device.

   b. ***Laboratory Definitive Testing***

112.     Laboratory testing is utilized when presumptive testing produces unexpected or unexplained results.

113.    Known as "definitive testing" or "confirmatory testing" (and formerly known as "quantitative testing"), the service involves different testing methods, and is more specific than presumptive testing.

114.    In the case of UDT, definitive testing produces a result that shows the specific quantity of a drug in a specimen.

115.    Definitive testing is unlike presumptive testing, and the differences are significant.

116.    Definitive testing is not for routine use when managing patient care.  Definitive testing is utilized for resolving unexpected results from POC drug screens.

117.    Definitive testing produces a precise numeric value representing the concentration of a specific drug in the sample using a more complex—and expensive—testing method than presumptive testing.

118.    Definitive testing is not to be administered broadly.  In the select cases where definitive testing is actually indicated, the analytes/drugs to be tested must be chosen carefully: the testing should be narrowly tailored to assess specific substances the patient is prescribed, or substances for which the patient tested unexpectedly positive during previous UDT.

119.    With respect to No-Fault claims, the Fee Schedule states that definitive laboratory testing should only be utilized when presumptive POC testing returns unexpected or unexplained results.

120.    The Defendants violated New York law by indiscriminately billing for definitive laboratory testing through TopLab without a legitimate basis.

### 2.    UDT Orders Caused By Fraudulent Treatment Protocols

121.    This scheme was designed such that UDT was ordered for all patients regardless of actual clinical need.  As detailed above, the Defendants conspired with others to ensure that UDT

was prescribed to claimants and that the testing orders were steered to TopLab.  For example, Elton's employment at MPS was contingent upon his compliance with predetermined protocols, which required that UDT be ordered in all cases; Elton also disclosed that TopLab was the laboratory of choice for the UDT orders generated by MPS.

122.   POC testing was not performed as a first-line screening tool before definitive laboratory testing was billed by TopLab.  Even when POC testing was performed, TopLab still billed for definitive laboratory testing despite "negative" results.

123.   Even if laboratory UDT was indicated (it was not), the testing billed by TopLab still served no legitimate medical purpose for prescription risk monitoring because the results were not reported until after claimants received prescriptions for pain medications, or for pre-surgical clearance because the results were not reported until after the surgeries were completed.

a.    *Exemplar Claim—Claimant J.T. (Claim No. 0605312487)*

124.   Claimant J.T. (claim no. 0605312487) was purportedly involved in a motor vehicle accident on November 1, 2020.

125.   Just 2 days later, on November 3, 2020, J.T. was initially ordered to undergo UDT by non-party physician Michael Alleyne, M.D., who was working for MPS.

126.   J.T. was neither taking nor prescribed opioids when the testing was ordered, and there was nothing in J.T.'s records to suggest a risk of abuse.

127.   There was no legitimate reason to order UDT for J.T.  In fact, TopLab's report found no evidence of illicit drug use or other indications for testing.

128.   J.T. was subsequently ordered to undergo pain management injections at a Moshe ASC (SCOB).  On the days of the procedure (January 14, 2021 and January 28, 2021), J.T. was ordered to undergo a second and third round of UDT for pre-surgical clearance.  There were no

indications for UDT orders because J.T. was neither taking nor prescribed any opioids when the testing was ordered.

129.   J.T.'s second and third UDT were meaningless because the results were not reported until 4 and 6 days after the ASC procedures, respectively.

130.   Even if the UDT was indicated for J.T. (it was not), the testing was still not necessary for pre-surgical clearance because TopLab did not report the results until after the procedures were complete.

131.   Accordingly, the UDT ordered and billed in connection with J.T. was medically unreasonable and unwarranted, and therefore TopLab's bills are not compensable under New York's No-Fault law.

### b.   *Exemplar Claim—Claimant K.A. (Claim No. 0573704749)*

132.   Claimant K.A. (claim no. 0573704749) was purportedly involved in a motor vehicle accident on December 19, 2019.

133.   K.A. was then examined by a provider working for non-party Citimedical I PLLC ("Citimedical"), an entity nominally owned by Moshe's sister but actually controlled by Moshe, according to allegations made in other actions.  *See Gov't Empls. Ins. Co. v. Moshe, et al.*, 1:20-cv-01098-FB-RER (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C., et al.*, No. 1:21-cv-05523-MKB-PK (E.D.N.Y.).   K.A. then treated with numerous providers, including non-party Citimed Complete Medical Care, P.C., which is another entity "owned" by Moshe's sister, and also non-party Optimum Acupuncture, P.C., which is an acupuncture company owned by Dolsky.

134.   K.A. was eventually ordered to undergo pain management injections at a Moshe ASC (Integrated).

135.   K.A. was ordered to undergo UDT for pre-surgical clearance on the days of the procedure. There were no other indications for UDT because K.A. was neither taking nor prescribed any opioids when the testing was ordered.   In each case, the testing was ordered by a provider working for the Moshe ASC:

| Date of Drug Test | Date of Surgical Procedure | Date Lab Results Reported |
|---|---|---|
| 12/2/2020 | 12/2/2020 | 12/8/2020 |
| 12/22/2020 | 12/22/2020 | 12/28/2020 |
| 1/26/2021 | 1/26/2021 | 2/1/2021 |

136.   K.A.'s UDT was meaningless because, in each instance, the results were not reported until 6 days after the procedure.  Even if the UDT was indicated for K.A. (it was not), the testing was still not necessary for pre-surgical clearance because TopLab did not report the results until after the procedure was complete.

137.   Accordingly, the UDT ordered and billed in connection with K.A. was medically unreasonable and unwarranted, and therefore TopLab's bills are not compensable under New York's No-Fault law.

c.   *Exemplar Claim—Claimant R.Z. (Claim No. 0489814896)*

138.   Claimant R.Z. (claim no. 0489814896) was supposedly involved in a motor vehicle accident on January 25, 2018.

139.   Thereafter, R.Z. was evaluated at MPS and ordered to undergo pain management injections at a Moshe ASC (Dynamic).

140.   R.Z. was ordered to undergo UDT for pre-surgical clearance on the day of the procedure (June 1, 2018).  The testing was ordered by a provider working for the Moshe ASC.

141.   R.Z.'s UDT was meaningless.  Even if the UDT was indicated for R.Z. (it was not), the test was still not necessary for pre-surgical clearance because TopLab did not report the results until 12 days later after the procedure was complete.

142.   Accordingly, the UDT ordered and billed in connection with R.Z. was medically unreasonable and unwarranted, and therefore TopLab's bills are not compensable under New York's No-Fault law.

### 3.   False Reasons for Ordering UDT

143.   The Defendants submitted letters of medical necessity in an attempt to justify the fraudulent charges even though there was no medical justification for the UDT billed by TopLab:



144.   According to the Defendants, UDT is "ordered before outpatient procedures to identify potential problems that might complicate surgery."  This is false.  When TopLab billed

for UDT ordered for pre-surgical clearance, the test results were not reported until many days after the surgery was completed. The chart annexed hereto at **Exhibit 1**, and incorporated herein by reference as if set forth in its entirety, contains a list of specific representative exemplar claims where TopLab reported pre-surgical clearance testing results <u>after</u> the claimant's procedure was completed.

145. The fraudulent nature of TopLab's claims is also shown through testimony that tests were ordered under a provider's name without his knowledge. Non-party physician Raafat Beshara, M.D. ("Beshara") testified in the matter *Gov't Empls. Ins. Co. v. Advanced Comprehensive Lab., LLC, et al.*, No. 1:20-cv-0239-KAM-VMS (E.D.N.Y.) that UDT was ordered under his name for patients of the Moshe ASCs without his knowledge:

```
                    Dr. R. Beshara
  the time we tell the pain management if
  they want to proceed, he can do it
  himself, the anesthesia.
          Very, very rare cases when it's
  being justified if it's something minor,
  but usually we don't give anesthesia.
      Q.      Okay.
              Would you ever order additional
  drug testing from an outside laboratory?
      A.      No, never.
```

146.    Beshara denied that he ever ordered the testing billed by TopLab, even after being shown a copy of a TopLab requisition form listing Beshara as the referring physician:

> Q.    So I would like to jump back up to page 4 of this exhibit.  And I would like to direct your attention to the top left corner where it says Requesting Physician.
>         Can you tell me who the Requesting Physician is listed as?
>         A.    Yeah, it's me, Beshara, Raafat.
>         I don't deal with the lab.  I don't send things into the lab.  I did not request this.

147.    Beshara also admitted that TopLab's tests were useless because the results were not even reported until after the procedure was complete:

Dr. R. Beshara

Q.     So I'll ask you again on this Laboratory Report, the date that the urine sample was collected was the same day that you administered anesthesia to this patient; is that correct?

A.     Yes.

Q.     Where it says "Reported," can you tell me the date?

A.     June 4 '19.

Q.     That's three days after you administered the anesthesia; right?

A.     Yes.

Q.     Since the report was generated three days after you administered the anesthesia, how are these testing results useful to you?

A.     No.

Q.     Would you say that they are not useful to you?

A.     Yes, not useful to me.

148.    Beshara also admitted that quantitative drug screens billed by TopLab were not necessary:

```
 1                Dr. R. Beshara
 2     screen and a qualitative urine drug
 3     screen?
 4         A.    Quantitative is specifically
 5     telling the amount.
 6         Q.    Okay.  And what's a qualitative?
 7         A.    I'm not sure.
 8         Q.    Doctor, is there any reason to
 9     do a quantitative drug test if the dip
10     stick test you described earlier came back
11     negative?
12         A.    As of my knowledge, no.  As an
13     anesthesiologist, I don't need any
14     quantitative.  As an anesthesiologist, I
15     just need to know if there is anything in
16     the system before I give anesthesia.
```

149.   Beshara's testimony is relevant because TopLab also billed Allstate for testing reportedly ordered by Beshara in connection with claimants treated at the Moshe ASCs.

150.   For example, claimant F.C. (claim no. 0507104636) was ordered to undergo pain management injections at Integrated.

151.   On the day of the procedure, F.C. was reportedly examined by Beshara, who was working at Integrated as an anesthesiologist.

152.   Beshara reportedly ordered UDT for F.C. on the date of the procedure (February 9, 2019), according to a TopLab requisition form:



153.    TopLab's testing was useless for pre-procedure clearance purposes because F.C.'s test results were not reported until 5 days after the procedure was performed.

154.    Based on Beshara's admissions, he did not order this UDT testing for F.C., and the results generated after the procedure were not useful to him.

155.    The UDT billed by TopLab was medically unreasonable and unwarranted in all cases, and therefore TopLab's bills are not compensable under New York's No-Fault law.

**4.    No Rational Selection of Analytes**

156.    When indicated, UDT orders must contain a rational selection of analytes to be tested.  For patients taking or prescribed opioids, UDT orders should include analytes for controlled substances and select anti-depressants and anti-convulsants that a patient is prescribed, plus analytes for any substances that registered unexpected positive results in prior UDT.

157.    Indiscriminate analyte testing is prohibited, yet TopLab routinely billed Allstate for UDT that covered around 60 different analytes in each case.

158.    For example, TopLab included a laundry list of analytes in its testing protocol, such as 6 anti-depressants, 12 benzodiazepines, over 10 illicit drugs, 16 opioids, 2 sedative hypnotics, and 8 stimulants.  TopLab's broad testing protocol was deployed for claimants with no history of drug abuse, no prescribed medications, and no unexpected positive results on previous tests.

a.    *Exemplar Claim—Claimant R.V.P. (Claim No. 0529938945)*

159.    Claimant R.V.P. (claim no. 0529938945) was purportedly involved in a motor vehicle accident on December 31, 2018.

160.    Afterwards, R.V.P. was ordered to undergo pain management procedures at a Moshe ASC (Integrated).

161.    R.V.P. was then ordered to undergo UDT on the day of each procedure even though R.V.P. was neither taking nor prescribed any medications.  Each time, the testing was ordered by a physician working at the Moshe ASC.

162.    Each of R.V.P.'s tests were steered to TopLab:

| Date of Collection | Date of Procedure | Lab Report Date | Number of Analytes Tested |
|---|---|---|---|
| 6/29/2019 | 6/29/2019 | 7/3/2019 | >60 Analytes |
| 7/11/2019 | 7/11/2019 | 7/15/2019 | >60 Analytes |
| 7/18/2019 | 7/18/2019 | 7/24/2019 | >60 Analytes |

163.    In all instances, the testing involved over 60 separate analytes, which is outrageous because there was no medical reason to test even a single analyte, let alone 60 different analytes.

164.    TopLab billed multiple analytes to increase the Defendants' billing and profits. TopLab's billing for excessive analytes wrongfully inflated the billing for each date of service.

165.    TopLab billed over $8,200.00 for UDT in connection with R.V.P.  Even if testing was indicated in the first place (it was not), each bill was wrongfully inflated by more than $2,400.00 because of TopLab's billing for multiple analytes.

166.    Indeed, TopLab billed confirmatory laboratory testing on nearly 70 different analytes on each date of service in connection with R.V.P.:

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 06/29/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80100 x 9 | 290.34 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2808.13 |

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 07/11/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 07/18/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

167.    The fact that R.V.P. underwent UDT on 3 separate days within a 3-week span is unreasonable and excessive.  Even if the first UDT was indicated for R.V.P. (it was not), multiple definitive tests were particularly unnecessary because R.V.P. was neither taking nor prescribed any controlled substances.

168.     R.V.P.'s UDT orders exhibit other hallmarks of this scheme: each time, UDT was ordered for pre-surgical clearance at a Moshe ASC, but the results were never reported until after the procedures were performed.

169.     Such testing is simply not rational or medically justified; it was exploitative and abusive.   Accordingly, the UDT ordered and billed in connection with R.V.P. was medically unreasonable and unwarranted, and therefore TopLab's bills are not compensable under New York's No-Fault law.

**b.     *Exemplar Claim—Claimant W.A. (Claim No. 0563067917)***

170.     Claimant W.A. (claim no. 0563067917) was purportedly involved in a motor vehicle accident on October 1, 2019.

171.     Thereafter, on December 30, 2019, W.A. was examined by non-party Ani Kalfayan, M.D. ("Kalfayan") and ordered to undergo UDT to check for drug use.   Using a pre-printed TopLab form, Kalfayan ordered definitive testing for every analyte offered for testing by TopLab:



172.     Kalfayan is no stranger to No-Fault fraud schemes; he participated in a billing fraud scheme involving anesthesia services at an ASC, according to allegations in *Gov't Empls. Ins. Co. v. He*, No. 2:19-cv-09465-KM-JBC (D.N.J.).

173.    The testing ordered by Kalfayan was unnecessary because W.A. was not taking nor prescribed any controlled substances, and there was no history or indications of substance abuse. In fact, TopLab's report confirmed there was no evidence of drugs (either prescription or illegal substances) present in W.A.'s system.

174.    Later, W.A. was ordered to undergo pain management procedures at Moshe ASCs (Dynamic and Integrated). On the day of each procedure, W.A. was ordered to undergo UDT by providers that were working at the Moshe ASCs. Again, the UDT was not indicated because W.A. was neither taking nor prescribed any medications.

175.    Despite the prior negative results, on March 7, 2020, W.A. was ordered to undergo definitive laboratory UDT using a pre-printed TopLab order form, which was marked "Include All Tests":



176.    On March 14, 2020, W.A was reportedly ordered by Beshara to undergo another round of UDT even though all prior testing (all conducted less than 100 days apart) produced negative results. Beshara's purported orders for definitive laboratory UDT were issued on a pre-printed TopLab order form marked "Include All Tests":



177.    As explained above, Beshara has denied ordering UDT for patients in connection with pain management procedures.

178.    W.A. also was ordered to undergo UDT at TopLab on May 29, 2020 again using a form marked to "Include All Tests":



179.    Rather than tailoring the UDT orders to the specific clinical needs of each patient, TopLab's boilerplate requisition forms encouraged or facilitated the ordering of excessive and

medically unnecessary testing, which enabled the Defendants to maximize TopLab's billing and profits.

180.    On average, TopLab billed for nearly 60 separate analytes each time claimants underwent UDT, which is outrageous because there was no medical reason to conduct any testing at all.  The chart annexed hereto as **Exhibit 2**, and incorporated herein by reference as if set forth in its entirety, contains a list of specific representative exemplar claims where TopLab billed for excessive analytes.

181.    Accordingly, the confirmatory UDT was medically unreasonable and unwarranted in all cases, and, therefore, TopLab's bills are not compensable under New York's No-Fault law.

## 5.    Useless Quantitative Drug Screens for Claimants Not Prescribed Opioids

182.    UDT is not indicated for non-acute pain management and should not be ordered routinely as part of a treatment protocol.  UDT could be indicated in limited cases such as when prescription opioids are planned, or when patients are already taking controlled substances.

183.    Here, however, TopLab repeatedly billed for UDT even though the claimants were not receiving opioid prescriptions, and were not already taking opioids or other controlled substances.

### a.    *Exemplar Claim—Claimant M.M. (Claim No. 0559064597)*

184.    Claimant M.M. (claim no. 0559064597) was purportedly involved in a motor vehicle accident on August 9, 2019.

185.    On August 12, 2019, M.M. was examined by non-party physician Hong Pak, M.D. ("Pak"), who was working for MPS.  Pak has a history of professional misconduct and has been disciplined by licensing boards in New Jersey and Pennsylvania.  Pak has also been accused of participating in other No-Fault schemes involving fraudulent prescriptions for medications and

35

medical equipment.  *See Gov't Empls. Ins. Co. v. Wallegood Inc., et al.*, No. 1:21-cv-01986-PKC-RLM (E.D.N.Y.); *Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.).  The allegations against Pak in *Wallegood* involve bogus prescriptions issued under Pak's name while working for MPS.

186.    M.M was neither taking nor prescribed any opioids or controlled substances at the time of the examination, and M.M. did not have a history of substance abuse.  Nevertheless, Pak ordered M.M. to undergo UDT during the initial examination at MPS.

187.    TopLab billed Allstate a total of $2,517.79 for testing ordered in connection with M.M.  TopLab's charges are not compensable under New York's No-Fault law because the tests were not medically necessary.

> **b.**    ***Exemplar Claim—Claimant J.H. (Claim No. 0575144126)***

188.    Claimant J.H. (claim no. 0575144126) was purportedly involved in a motor vehicle accident on January 12, 2020.

189.    On January 23, 2020, J.H. was examined by a provider working for MPS and was ordered to undergo UDT.

190.    J.H. was neither taking nor prescribed opioids at the time of the examination, and there was no other evidence of substance abuse.  However, J.H. was still ordered to undergo UDT during the very first visit to MPS.

191.    TopLab billed Allstate a total of $2,517.79 for testing ordered in connection with J.H.  TopLab's charges are not compensable under New York's No-Fault law because the tests were not medically necessary.

c.    ***Exemplar Claim—Claimant A.L. (Claim No. 0597435213)***

192.    Claimant A.L. (claim no. 0597435213) was purportedly involved in a motor vehicle accident on August 21, 2020.

193.    A few days later, on August 25, 2020, A.L. was examined by non-party physician John Greco, M.D. ("Greco"), who was working for non-party Tri-borough NY Medical Practice P.C. (the successor to MPS) at a clinic located at 2488 Grand Concourse in Bronx, NY.  The clinic at 2488 Grand Concourse has been the subject of several other No-Fault fraud actions in this District.  *See Gov't Empls. Ins. Co. v. JP Rx Corp, et al.*, No. 1:22-cv-01248-PKC-LB (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Insta Drugs Inc., et al.*, No. 1:22-cv- 02533-AMD-MHH (E.D.N.Y.).  And the prescriber, Greco, was identified as a major source of bogus pharmaceutical prescriptions while working for MPS at the 2488 Grand Concourse clinic.  *See Gov't Empls. Ins. Co. v. JMD Pharmacy Inc.*, No. 1:22-cv-03629-LDH-PK (E.D.N.Y.).

194.    A.L. was ordered to undergo UDT during the initial examination even though A.L. was neither taking nor prescribed opioids at the time of examination, and there was no other evidence of substance abuse.

195.    Even if UDT was indicated for A.L. (it was not), the testing was still meaningless because the specimen was collected on August 25, 2020 but then not analyzed until 7 days later on September 2, 2020, which was 1 week after Greco had prescribed pain medication to A.L. and after the pharmacy purportedly dispensed the prescribed medications to A.L.

196.    TopLab billed Allstate a total of $2,686.92 for testing ordered in connection with A.L.  TopLab's charges are not compensable under New York's No-Fault law because the tests were not medically necessary.

### d. *Exemplar Claim—Claimant J.G. (Claim No. 0595330135)*

197.    Claimant J.G. (claim no. 0595330135) was purportedly involved in a motor vehicle accident on August 3, 2020.

198.    The following day (August 4, 2020), J.G. was supposedly ordered to undergo UDT by Greco, a provider working for MPS at a clinic located at 2488 Grand Concourse in Bronx, NY:



199.    The UDT orders were given even though J.G. was neither taking nor prescribed opioids at the time of examination, and there was no other evidence of substance abuse.

200.    Even if UDT was indicated for J.G. (it was not), the testing billed by TopLab was meaningless because the testing specimen was reportedly obtained on August 4, 2020, but the results were not reported until nearly 1 month later on September 2, 2020:



201.    The validity of the testing billed by TopLab is questionable because J.G.'s sample was reportedly collected on August 4, 2020 at 4:40 am, which is outside business hours.  J.G.'s testing sample then sat for 4 days until August 8, 2020 when it was received by TopLab at 4:40 am, which also outside business hours.  J.G.'s testing sample then sat untested for an additional 25 days until TopLab's report was issued on September 2, 2020.

202.    Even if UDT was actually provided on August 4, 2020, the testing was still meaningless as a risk monitoring tool because Greco prescribed pain medications for J.G. nearly 30 days before the UDT results were reported by TopLab.  The long delay in reporting the UDT results needlessly increased J.G.'s risk of harm from adverse drug effects.

203.    TopLab billed Allstate a total of $2,686.92 for testing ordered in connection with J.G.  TopLab's charges are not compensable under New York's No-Fault law because the tests were not medically necessary.

204.    There is simply no medical rationale for ordering UDT for all patients in the absence of prescribed controlled substances or a documented history of substance abuse.

205.    However, the Defendants conspired with others to generate UDT orders and steer them to TopLab to enable to the Defendants to submit No-Fault claims to Allstate.  The chart annexed hereto as **Exhibit 3**, and incorporated herein by reference as if set forth in its entirety,

contains a list of specific representative exemplar claims where TopLab billed UDT that was ordered even though the claimant was not prescribed opioids and did not have a documented history of substance abuse.

### 6. Meaningless Repetition of UDT for Low-Risk Patients

206.    Claimants were ordered to undergo UDT on a repeated basis even though the claimants had no evidence of risk to warrant such repeated testing.

### a. *Exemplar Claim—Claimant C.S. (Claim No. 0558659843)*

207.    Claimant C.S. (claim no. 0558659843) was purportedly involved in a motor vehicle accident on August 25, 2019.

208.    C.S. was evaluated on September 5, 2019 by Elton, who was working for MPS.

209.    C.S. was not taking controlled substances, and did not have a history of substance abuse.  C.S. was not prescribed any opioids or controlled substances by Elton.

210.    However, at this initial evaluation, Elton still ordered C.S. to undergo UDT for a variety of specific drugs pursuant to the protocols that he was required to follow at MPS.  The tests were billed by TopLab.

211.    C.S. was later scheduled for surgery at a Moshe ASC (Integrated), and was ordered to undergo another round of UDT for pre-surgical clearance.  TopLab supposedly collected C.S.'s testing specimens on December 16, 2019 (the same day as the surgery), but the UDT results were not reported until 3 days later on December 19, 2019, which was after the surgery was performed.

212.    Even if the results were timely reported, the UDT was still unnecessary because there was no reason to monitor C.S. for drugs of abuse and other controlled substances.

213.     TopLab submitted bills to Allstate totaling $5,229.62 seeking No-Fault payments for medically unnecessary and non-compensable UDT in connection with C.S.

**b.**  ***Exemplar Claim—Claimant A.L. (Claim No. 0500216502)***

214.  Similarly, claimant A.L. (claim no. 0500216502) was supposedly involved in a motor vehicle accident on April 28, 2018.

215.  A.L. was examined on January 22, 2019 by a physician working for MPS (non-party David Abbatematteo, M.D. ("Abbatematteo")).

216.  Abbatematteo recommended that A.L. undergo pain management injections at a Moshe ASC (Dynamic).

217.  A.L. was not taking controlled substances, and did not have a history of substance abuse.  A.L. was not prescribed any opioids or controlled substances by Abbatematteo, but A.L. was still ordered to undergo UDT prior to the procedure.

218.  A.L.'s UDT specimen was collected on the same day as the injection procedure, but TopLab did not report the UDT results until nearly 1 week after A.L.'s procedure.

219.  There was no reason for A.L. to undergo the UDT billed by TopLab—the results did not affect A.L's treatment because they were obtained long after the procedure was complete.

220.  On March 29, 2019, A.L. returned to Dynamic for additional pain management injections.

221.  Consistent with the pattern of the Defendants' scheme, A.L. was ordered to undergo additional UDT for pre-procedure clearance, even though there still were no reasons to justify UDT, especially for a second time within 60 days of the first test, which was negative for all substances.

222.  A.L.'s specimen was collected on the day of the procedure, but TopLab did not report the UDT results until 4 days later, which was after A.L.'s procedure was complete.

223.   TopLab submitted bills to Allstate totaling $5,616.26 seeking No-Fault payments for medically unnecessary and non-compensable UDT in connection with A.L.

C.   **FRAUDULENT BILLING**

1.   **Unlawful Use of Deleted CPT Codes**

224.   The American Medical Association developed and published the Current Procedural Terminology ("CPT") coding system.

225.   This system was designed to help standardize medical terminology and provide uniform language for coding medical services and procedures.

226.   Improper coding practices are not an option for healthcare providers.

227.   The law mandates that accurate CPT codes be used, and the rules that govern CPT codes mandate that they must be used properly.

228.   Providers subject to the Health Insurance Portability and Accountability Act (HIPAA) are required to use CPT codes when submitting bills.

229.   Here, TopLab routinely billed Allstate for UDT under CPT codes 80100, 80101, or 80102.

230.   CPT codes 80100, 80101, and 80102 were deleted in 2015 as part of an overhaul of all laboratory drug testing codes.

231.   New codes for presumptive testing were introduced, which were based on drug class and the testing method used.  The 2015 overhaul also introduced a single code to be used when testing a drug of any quantity, which replaced the prior regime in which multiple units of CPT codes 80100 or 80101 had been billed per drug.

232.     Definitive drug testing, which had previously been billed with multiple units of CPT code 80102, were replaced with specific codes from CPT codes 80320 through 80377 that corresponds with the substance being tested.

233.     The AMA created the new codes to more clearly define the drug testing methodologies employed for preliminary drug screening and confirmation.

234.     TopLab wrongfully billed Allstate for CPT 80100, 80101 and 80102, all of which were deleted as of December 31, 2014.

> **a.     Exemplar Claim—Claimant R.V.P. (Claim No. 0529938945)**

235.     As an example, Allstate claimant R.V.P. purportedly underwent UDT on 3 separate occasions on June 29, 2019, July 11, 2019, and July 18, 2019.

236.     TopLab billed Allstate in connection with laboratory services allegedly provided to R.V.P. for each of the aforementioned dates of services totaling over $8,000.00.

| | | 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 06/29/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80100 x 9 | 290.34 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2808.13 |

| | | 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 07/11/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 07/18/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

237.    Each of the bills submitted in connection with R.V.P. included charges for CPT codes that no longer exist, namely CPT 80100, 80101, and 80102.

238.    Charges submitted in connection with deleted CPT codes are invalid, falsely reported, and non-compensable under New York law.

**b.    *Exemplar Claim—Claimant B.R. (Claim No. 0544206535)***

239.    Claimant B.R (claim no 0544206535) was allegedly involved in a motor vehicle accident on May 3, 2019.

240.    B.R. purportedly underwent UDT on 3 separate occasions on September 13, 2019, February 21, 2020, and August 17, 2020.

241.    TopLab billed Allstate in connection with laboratory services allegedly provided to B.R. for each of the aforementioned dates of service totaling over $8,000.00.

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 09/13/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| 15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 02/21/2020 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

| 15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 08/17/2020 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

242.    Each TopLab bill submitted in connection with B.R. included charges for CPT codes that no longer exist, namely CPT 80101 and 80102.

243.    Charges submitted in connection with deleted CPT codes are invalid, falsely reported, and non-compensable under New York law.

244.    TopLab routinely billed Allstate in connection with the deleted codes in an attempt to maximize profits.  The chart annexed hereto as **Exhibit 4**, and incorporated herein by reference as if set forth in its entirety, contains a list of specific representative exemplar claims where TopLab billed for laboratory testing using deleted CPT codes.  The billing submitted by TopLab using the deleted CPT codes is invalid, falsely reported, and non-compensable under New York law.

## 2.    Unlawful Unbundling of Laboratory Charges

245.    Unbundling, in the context of medical billing, is a fraudulent and abusive tactic.

246.    Unbundling occurs when a provider bills multiple CPT codes for a service even though the service is properly billed under a singular CPT code.

247.     Here, the Defendants engaged in rampant unbundling in connection with TopLab's bills.

248.     Unbundling helped the Defendants maximize TopLab's charges and profits.

249.     TopLab improperly billed under CPT codes 81002, 81003, and 82570 for specimen validity testing, in addition to using a UDT code.

250.     Specimen validity testing ("SVT") is performed to ensure the urine specimen is not adulterated.

251.     SVT is an internal control process and is not separately billed with any of the drug testing methods, whether presumptive or definitive testing.

252.     SVT is considered a component of UDT that is billed with presumptive or definitive drug testing codes and is not separately reportable.

253.     Defendants routinely submitted charges to Allstate for SVT alongside charges for UDT.

254.     Specifically, the Defendants improperly unbundled charges for SVT by billing separately for CPT codes 81002, 81003, and/or 82570 in addition to UDT codes.

255.     As an example, Allstate claimant B.R. underwent UDT on 3 separate occasions on September 13, 2019, February 21, 2020, and August 17, 2020.

256.     TopLab billed Allstate in connection with laboratory services allegedly provided to B.R. for each of the aforementioned dates of services totaling over $8,000.00.

| 15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 09/13/2019 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | | TOTAL CHARGES TO DATE$ | 2711.83 |

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 02/21/2020 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | TOTAL CHARGES TO DATE \$ | | 2711.83 |

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 08/17/2020 | TOPLAB 07041 | DRUG SCREEN: multiple classes, each procedure | 80101 x 9 | 194.04 |
| | | DRUG CONFIRMATION: each procedure | 80102 x 68 | 2492.88 |
| | | Urinalysis pH | 81002 x 1 | 6.59 |
| | | Urinalysis SG | 81003 x 1 | 6.59 |
| | | Urine Creatine | 82570 x 1 | 11.73 |
| | | TOTAL CHARGES TO DATE \$ | | 2711.83 |

257.    Here, the Defendants unbundled charges for SVT on 3 occasions for B.R. by billing Allstate for separate charges under CPT codes 81002, 81003, and 82570 while simultaneously charging Allstate for presumptive and definitive testing.

258.    SVT is considered a component of UDT that is billed with presumptive or definitive drug testing codes and is not separately billable.

259.    Defendants fraudulently charged for SVT in an attempt to maximize profits. This practice of unbundling is unlawful and the Defendants knew it.

260.    The Defendants routinely submitted fraudulent charges for SVT. The chart annexed hereto as **Exhibit 5**, and incorporated herein by reference as if set forth in its entirety, contains a non-exhaustive list of specific exemplar claims where TopLab fraudulently unbundled charges for laboratory testing.

261.    Because TopLab's charges were unbundled and purposely misrepresented, the charges submitted to Allstate in connection with these services were false, fraudulent, and not compensable under New York's No-Fault laws.

### 3.    Unlawful Charges for Services Performed by a Reference Lab

262.    TopLab is not permitted to collect No-Fault payments for services performed by a different laboratory.   The Fee Schedule specifically states that "only the laboratory rendering the service may bill and such shall be submitted directly to the responsible payer."

263.    Further, "[p]ayment for laboratory services will be made only to the laboratory services provider actually performing the test." 18 N.Y.C.R.R. § 505.7(g)(3).

264.    Here, the Defendants caused TopLab to seek No-Fault payments for services provided by other laboratories, which is against New York's No-Fault laws.  For example, TopLab billed for testing in connection with claimant Y.C. (claim no. 0581025947), but the testing was actually performed by a different provider (non-party Lenco Diagnostic Laboratories, Inc.):



**Final Copy**

**Confidential – Laboratory Report**

## ◇TOPLAB

### Laboratory Report

67-71 EAST WILLOW STREET
MILBURN, NJ 07041

Lab Director: Ayad Mudarris
Tel#: (877)355-3580
Fax#: (866)899-3995
CLIA Number: 31D2135687

| Client Information: | Patient Information: | | Sample Information: | |
|---|---|---|---|---|
| Client: ▮▮▮▮▮ | Patient Name: ▮▮▮▮▮ | | Lab Sample ID: 2012120006 | |
| | Patient ID: | | Collected: | 12/11/2020 07:06 AM |
| | Date of Birth: ▮▮▮▮▮ | | Received: | 12/12/2020 07:06 AM |
| Requesting Physician: | Male/Female: | Male | Reported: | 12/13/2020 09:57 PM |
| | Fasting: | NO | | |

| Test | Result | Flag | Units | Ref. Range |
|---|---|---|---|---|
| **CBC with Automated Diff** | | | | |
| White Blood Count | 6.6 | | THOUS/MCL | 3.8-10.4 |
| Red Blood Count | 4.21 | | MILL/MCL | 3.8-5.1 |
| Hemoglobin | 13.1 | | G/DL | 11.7-15.5 |
| Hematocrit | 39.3 | | % | 38-50 |
| MCV | 93.5 | | FL | 80-100 |
| MCH | 31.2 | | PG | 27-33 |
| MCHC | 33.4 | | G/DL | 32-36 |
| RDW | 14.9 | | % | 11-15 |
| Patelets | 245 | | THOUS/MCL | 140-400 |
| MPV | 9.9 | | FL | 7.4-11.6 |
| Neutrophils % | 59 | | % | 40-75 |
| Lymphocytes % | 36.2 | | % | 13.1-56.2 |
| Monocytes % | 3 | | % | <13 |
| Eosinophil % | 1 | | % | <8 |
| Basophils % | 1 | | % | <2 |
| Neutrophils | 3.9 | | THOUS/MCL | 1-6.2 |
| Lymphocytes | 2.4 | | THOUS/MCL | 1-4.3 |
| Monocytes | 0.2 | | THOUS/MCL | 0.1-1 |
| Eosinophils | 0.1 | | THOUS/MCL | <0.80 |
| Basophils | 0 | | THOUS/MCL | <0.20 |

```
CBC with Automated Diff
Test Performed at Lenco Diagnosis labs 1857 86 Street
Brooklyn, NY 11214 CLIA # 33D1012663
```

265.    TopLab is not eligible to collect No-Fault payments for services performed by another laboratory, yet the Defendants submitted bills identifying TopLab as the treating provider, which is false.

## VI.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

266.   The Defendants submitted, or caused to be submitted, documentation to Allstate in support of TopLab's No-Fault claims for medically unnecessary laboratory services, including, but not limited to, bills, invoices, medical records, requisition forms, and lab reports.

267.   The documents submitted in support of TopLab's No-Fault claims contained material misrepresentations about the delivery and the medical necessity of the laboratory services allegedly provided.

268.   The Defendants falsely certified that TopLab was eligible to collect payment under New York's No-Fault laws as a means to induce Allstate to promptly pay TopLab's No-Fault claims.

269.   Providers may collect No-Fault payments directly from insurers, but only for necessary medical services.

270.   Thus, every time the Defendants submitted bills, requisition forms, lab reports, and other documents to Allstate in support of TopLab's No-Fault claims, the Defendants necessarily warranted that the bills and medical records reflected necessary medical services that were actually performed by TopLab.

271.   The full extent of the Defendants' fraudulent acts—including billing for performing unnecessary and excessive laboratory services (including UDT) and using fraudulent billing practices—was not and could not have been known to Allstate until shortly before filing this Complaint.

272.   The Defendants took advantage of the technical nature and complexity of the laboratory services billed by TopLab as a way to conceal their misconduct, which included (a)

misrepresenting the necessity of the services provided, and (b) failing to accurately and completely submit charges in connection with the laboratory services purportedly provided.

273.    Allstate is obligated to pay or deny claims received from providers within a short period of time, even bills for specialized services such as clinical laboratory testing.

274.    The Defendants falsely represented the necessity of the laboratory services billed by TopLab in connection with pain management treatment and low-risk surgical procedures. TopLab also billed for tests that were ordered because of prohibited referrals and predetermined treatment protocols. And TopLab also charged excessive fees for medically unnecessary laboratory services.

## VII.   **ALLSTATE'S JUSTIFIABLE RELIANCE**

275.    Each claim submitted to Allstate by (or on behalf of) TopLab was verified pursuant to Insurance Law § 403.

276.    Gladstein, Frenkel, and Dolsky own TopLab and are responsible for operating the enterprise in accordance with New York law.

277.    Moreover, Gladstein, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity and in accordance with each and every aspect of the oath he took as a licensed medical professional.

278.    To induce Allstate to promptly pay TopLab's patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that TopLab was eligible to be reimbursed under New York's No-Fault laws.

279.    Further, to induce Allstate to promptly pay the fraudulent charges for laboratory services purportedly provided to claimants, the Defendants hired attorneys to pursue collection of

the fraudulent charges from Allstate. These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate.

280.   Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) TopLab in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

281.   At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding TopLab's reimbursement eligibility under New York law.

282.   In reasonable reliance on these misrepresentations, Allstate paid money to TopLab to its detriment.

283.   Allstate would not have paid these monies had the Defendants provided true and accurate information about the services billed by TopLab, and their eligibility to collect No-Fault payments under automobile insurance policies issued by Allstate.

284.   At all relevant times, the Defendants concealed from Allstate the truth regarding the facts and medical necessity of the laboratory services allegedly performed to prevent Allstate from discovering that the claims submitted by the Defendants were not compensable under New York's No-Fault laws.

285.   These misrepresentations include submitting false medical documentation, including bills, documenting the fact and necessity of the testing in order to seek No-Fault payments.

286.     The Defendants utilized their superior knowledge of the complex and specialized testing methodologies and billing practices associated therewith to conceal the nature and extent of their scheme.

287.     Due to the Defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before filing the within Complaint.

288.     Allstate made No-Fault payments to TopLab in reasonable reliance on the Defendants' misrepresentations.

289.     Allstate would not have paid these monies to TopLab had the Defendants provided true and accurate information about the fact and necessity of the testing provided.

## VIII.  SPECIFIC ALLEGATIONS OF MAIL FRAUD AND RACKETEERING ACTIVITY

290.     The Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

291.     Unless otherwise pled to the contrary, all documents, invoices, requisition forms, NF-3 bills, health insurance claim forms, No-Fault claim documents, letters, and requests for payment that the Defendants submitted to Allstate through (or on behalf of) TopLab in connection

with the claimants referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

292.    Every insurance claim detailed within involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

293.    The Defendants used the U.S. Mail to further their fraudulent scheme and conduct the affairs of the TopLab enterprise; they caused records and bills from TopLab to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

294.    The Defendants and/or persons working under their direction or control caused TopLab to falsely certify that it was, in all respects, eligible to collect No-Fault payments each time that TopLab mailed a demand for payment (i.e., NF-3 bill or other invoice) to Allstate.

295.    Gladstein, Frenkel, and Dolsky either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription/requisition records and treatment records, laboratory reports, and/or invoices/bills from TopLab to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

296.    The Defendants' misconduct violated applicable licensing laws and rendered TopLab ineligible for payment under New York's No-Fault laws.

297.    The Defendants committed mail fraud because they used the U.S. Mail to submit TopLab's No-Fault claims even though TopLab was not entitled to No-Fault payments.

298.    At all relevant times, the Defendants knew that claimants, insurance carriers, claimants' attorneys, other medical providers, and/or Allstate would use the U.S. Mail in connection with each of TopLab's fraudulent No-Fault claims, including issuing payments in reliance on the documents mailed by the Defendants in support of the claims.

299.    Allstate estimates that the Defendants' scheme generated hundreds of mailings. A representative sampling of mailings made in furtherance of the TopLab enterprise is listed in the chart annexed at **Exhibit 6** and incorporated herein by reference as if set forth in its entirety.

## IX.    <u>DAMAGES</u>

300.    The Defendants' pattern of fraudulent and unlawful conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made to TopLab in excess of $1,070,000.00, the exact amount to be determined at trial. The chart annexed at **Exhibit 7**, and incorporated herein by reference as if set forth in its entirety, identifies Allstate's payments to TopLab in connection with fraudulent and non-compensable No-Fault claims.

## X.    <u>CAUSES OF ACTION</u>

**<u>COUNT I</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ADVANCED COMPREHENSIVE LABORATORY LLC d/b/a TOPLAB ENTERPRISE**
**(Against Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky)**

301.    Allstate re-alleges and incorporates by reference ¶¶ 1-300 set forth above as if fully set forth herein.

302.    In furtherance of their operation and management of TopLab, Defendants Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky ("Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

303.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at **Exhibit 6**.

304.    Among other things, NF-3 forms, documents, notes, reports, invoices, requisition forms, health insurance claim forms, assignment of benefit forms, and other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

305.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

306.    Payments made by Allstate to TopLab were delivered through the U.S. Mail.

307.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to laboratory services performed by TopLab for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

308.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and

employees, issued drafts to TopLab, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

309.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme without being detected.

310.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

311.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to TopLab for the benefit of the Count I Defendants.

312.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

313.    TopLab constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

314.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

315.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

316.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

317.     By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## ADVANCED COMPREHENSIVE LABORATORY LLC d/b/a TOPLAB ENTERPRISE
### (Against Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky)

318.     Allstate re-alleges and incorporates by reference ¶¶ 1-300 set forth above as if fully set forth herein.

319.     Through their participation in the operation and management of TopLab, Defendants Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky (collectively, the "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

320.     The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of TopLab by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in **Exhibit 6**, and through the preparation and/or submission of fraudulent insurance claim documents, including bills, to Allstate.

321.     The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of TopLab even though TopLab, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

322.     The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

323.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

324.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## COMMON LAW FRAUD
### (Against All Defendants)

325.    Allstate re-alleges and incorporates by reference ¶¶ 1-300 set forth above as if fully set forth herein.

326.    The Defendants schemed to defraud Allstate through the provision of laboratory services that were excessive, not clinically necessary, and rendered pursuant to a predetermined protocol designed to ensure financial enrichment.

327.    The Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact relating to TopLab's eligibility to collect No-Fault payments under New York law.

328.    The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Allstate by collecting No-Fault payments through TopLab when they were ineligible for No-Fault reimbursement.

329.    The Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

330.    Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning TopLab's eligibility to collect No-Fault payments when processing their numerous claims for assigned No-Fault benefits.

331.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to TopLab in excess of $1,070,000.00 for healthcare expenses and services rendered to Allstate claimants, even though TopLab was, at all relevant times, ineligible to collect No-Fault payments under New York law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

332.    Allstate re-alleges and incorporates by reference ¶¶ 1-300 set forth above as if fully set forth herein.

333.    As alleged herein, the Defendants conspired to induce Allstate to make numerous and substantial payments to TopLab pursuant to New York's No-Fault Laws.

334.    As alleged herein, TopLab was never eligible for payment under New York's No-Fault Laws because, at all relevant times, TopLab billed for laboratory services that were excessive, not clinically necessary, and rendered pursuant to a predetermined protocol designed to put profits over patient care.

335.    When making payments to TopLab, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that Defendants (or those persons working under their control) made concerning TopLab's reimbursement eligibility under New York's No-Fault Laws.

336.    Each and every No-Fault payment that Allstate was caused to make to TopLab during the course of this scheme constitutes a benefit that the Defendants aggressively caused TopLab to seek and voluntarily accept.

337.    Throughout the course of their scheme, the Defendants caused TopLab to wrongfully obtain a multitude of payments from Allstate—in excess of $1,070,000.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

338.    Throughout the course of this scheme, the Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to TopLab.

339.    Retention of those benefits by the Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT V
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Advanced Comprehensive Laboratory LLC d/b/a TopLab)

340.    Allstate re-alleges and incorporates by reference ¶¶ 1-300 set forth above as if fully set forth herein.

341.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of laboratory services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

342.    TopLab was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to collect No-Fault payments because it (a) performed and billed for laboratory testing services that were not clinically indicated or medically necessary, (b) submitted excessive and/or false charges for laboratory testing

services, and (c) billed for laboratory testing services that were ordered because of unlawful or prohibited referral arrangements with clinics and providers.

343.   TopLab continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

344.   TopLab continues to challenge Allstate's prior claim denials.

345.   TopLab continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

346.   A justifiable controversy exists between Allstate and TopLab because TopLab rejects Allstate's ability to deny such claims.

347.   Allstate has no adequate remedy at law.

348.   TopLab also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by TopLab.

349.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that TopLab has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, TopLab.

## XI.   <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance

Company (collectively, "Allstate" or "plaintiffs"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ADVANCED COMPREHENSIVE LABORATORY LLC d/b/a TOPLAB ENTERPRISE**
**(Against Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ADVANCED COMPREHENSIVE LABORATORY LLC d/b/a TOPLAB ENTERPRISE**
**(Against Mark Gladstein, M.D., Victoria Frenkel, and Vadim Dolsky)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT III**
**COMMON LAW FRAUD**
**(Against All Defendants)**

(a)     AWARD Allstate's actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct; and

63

(c)     AWARD Allstate its costs in defending No-Fault collection actions filed by TopLab seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

**COUNT V**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Advanced Comprehensive Laboratory LLC d/b/a TopLab)**

(a)     DECLARE that TopLab's activities are unlawful;

(b)     DECLARE that TopLab was operated in violation of applicable New York licensing laws and regulations at all relevant times, and therefore was never eligible to collect payments under New York's No-Fault laws;

(c)     DECLARE that Allstate has no obligation to pay any No-Fault claims submitted by TopLab; and

(d)     GRANT all other relief this Court deems just and appropriate.

**XII.**     **JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW7455)
mwhitcher@ktmpc.com
Caitlin F. Keresey (CK3994)
ckeresey@ktmpc.com
100 Ring Road West, Suite 211
Garden City, NY 11530
(347) 710-0050 (phone)
(347) 710-0055 (fax)

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity
Company, Allstate Property & Casualty Insurance
Company, and Allstate Fire and Casualty Insurance
Company*

Dated: August 14, 2023